Debra CULBERSON, et al., Plaintiffs,

v.

Vincent DOAN, et al., Defendants.

No. C–1–97–965.

United States District Court,
S.D. Ohio,
Western Division.

Dec. 14, 2000.
Amending Order Jan. 1, 2001.

Alphonse Adam Gerhardstein, Laufman & Gerhardstein, Cincinnati, OH, for Debra Culberson, Christina Marie Culberson, Roger Culberson, plaintiffs.

Neil Frank Freund, Lynnette Pisone Ballato, Freund Freeze & Arnold, Dayton, OH, for Richard Payton.

Lawrence Edward Barbiere, Robert Stanford Hiller, Schroeder Maundrell Barbiere & Powers, Cincinnati, OH, for Village of Blanchester OH.

Julie Goldscheid, Martha Davis, Now Legal Defense, New York, NY, for Violence Against Women Act, amicus.

Gerald Francis Kaminski, U.S. Attorney, Cincinnati, Marcia K Sowles, U.S. Department of Justice, Civil Division, Washington, DC, for USA, intervenors.

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on Defendants' Motions for Summary Judgment (docs. 128 & 131); Plaintiffs' Response (doc. 139); and Defendants' Replies (docs. 140 & 141). In addition the Court held a hearing in this matter on November 16, 2000 (doc. 142).

## BACKGROUND

### A. *Introduction to the Parties and the Complaint*

The Estate of Clarissa Ann Culberson, Clarissa Culberson's parents, Debra and Roger Culberson, and her sister, Christina Marie Culberson (hereinafter, collectively referred to as "Plaintiffs" or the "Culberson Family") originally brought this action on October 24, 1997, pursuant to the "Violence Against Women Act of 1994," Title 42 U.S.C. § 13981, *et seq.*, additional civil rights and due process violations, pursuant to 42 U.S.C. § 1983, and three state law torts against Vincent Doan (hereinafter, "Doan"), Lawrence Baker, Tracey Baker (hereinafter, collectively referred to as the "Bakers" or the "Baker Family"), Richard Payton, individually and in his official capacity as Chief of Police of the Village of Blanchester (hereinafter, "Defendant Payton" or "Chief Payton"), and the Village of Blanchester (hereinafter, the "Village" or the "Village of Blanchester") (doc. 1).

The Village of Blanchester is a unit of government organized under the laws of the State of Ohio and is physically located within the jurisdiction of Clinton County (*Id.*).

In addition, Plaintiffs allege in their Complaint that Defendant Richard Payton has at all times relevant to this action been the Chief of Police of the Village of Blanchester, Ohio (*Id.*). Furthermore, Plaintiffs assert that Chief Payton is the highest ranking law enforcement official in the Village (*Id.*). Plaintiffs further allege that all of his actions, as alleged in the Complaint, were taken within the scope of his employment as an employee of the Village of Blanchester and that is why they are suing Chief Payton in his individual, as well as official capacity (*Id.*).

Jurisdiction over the federal civil rights claims is conferred by Title 28 U.S.C. §§ 1331 and 1343(3)-(4). Jurisdiction over the state law claims is conferred by Title 28 U.S.C. § 1367(a).

## B. *Statement of the Facts*

The facts as alleged by Plaintiffs in their Complaint (*see* doc. 1) and in their Response (*see* doc. 139) concerning the disappearance and subsequently-ruled death of Clarissa Culberson (hereinafter, "Carrie" or "Carrie Culberson") are sketchy, yet they tell a grim tale of domestic abuse.

Plaintiffs Debra and Roger Culberson are the parents of Carrie Culberson, who was allegedly killed by Vincent Doan on or about August 28, 1996, at the age of 22 years old (*see* docs. 1 & 139). Plaintiff Christina Culberson is the sister of Carrie Culberson. Vincent Doan is the son of Defendant Lawrence Baker and Doan is the half-brother of Defendant Tracey Baker. In the Complaint, Plaintiffs allege that Chief Payton is a close, personal friend of the individually named Defendants.

Carrie lived with her mother and sister in Blanchester, Ohio. During 1995, Carrie and Doan dated on a regular basis. Plaintiffs allege that, in the Fall of 1995, Doan began to physically abuse Carrie. Plaintiffs contend that on one occasion Doan "tightly clamped his hand over the nose, mouth and throat of [Carrie], who injured her face trying to pry his fingers off her mouth" (*see* doc. 1 ¶ 13). Plaintiffs maintain that the abuse continued in 1996, pointing to an incident in which Doan smashed the windows of Carrie's car as she sat in the vehicle. Although Carrie allegedly reported the incident to the Village of Blanchester Police Department, Plaintiffs assert that no charges were ever filed against Doan and the abuse by Doan intensified.

For example, Plaintiffs allege that Doan subsequently attacked Carrie in April, July, and August of 1996. As a result of the April 1996 attack, Plaintiffs contend that Doan caused injuries to Carrie's head and kidneys. Thereafter, Carrie allegedly filed a report with the Village police, however, the police did not bring any charges against Doan. On July 5, 1996, Plaintiffs allege that Doan forced his way into Carrie's home and threatened her in order to prevent Carrie from having any contact with other men.

During this incident, Doan allegedly pushed Carrie's mother, Debra Culberson, in an unsuccessful attempt to assault Carrie. Debra Culberson also filed a criminal report with the Village police regarding the incident, but asserts that, the police did not respond to the report, and, thus, the abuse was allowed to continue.

For instance, on July 28, 1996, Plaintiffs allege that Doan again attacked Carrie when she came to his house while on an errand. Plaintiffs assert that, during this assault, he threw Carrie across a room and struck her in the head with a metal object, causing her to need surgical staples in her scalp. Carrie again sought criminal charges after this attack through the Village police. However, according to Plaintiffs, Carrie's attempts to get help were again unsuccessful and Doan was never investigated or arrested for his assaults that were inflicted upon her. On August 26, 1996, approximately three days before Doan allegedly murdered Carrie, Plaintiffs assert that he held her at gunpoint in a barn located within the area of the Village of Blanchester.

On August 29, 1996, at approximately 12:20 a.m., a neighbor of Doan witnessed him hitting Carrie in the head. At approximately 1:30 a.m., Doan allegedly spoke with his father, Lawrence Baker, on the telephone about an undisclosed matter. At 3:15 a.m., Doan allegedly arrived at the residence of his brother, Tracey Baker, with blood on his chest, arms, and pants. Doan then allegedly took a shower and left the residence with Tracey Baker, who was carrying a handgun and garbage bags.

On the same morning of August 29, 1996, at approximately 11:00 a.m., Debra Culberson reported her daughter missing to the Village of Blanchester Police Chief, Defendant Payton. Debra Culberson also reminded Chief Payton at that time of the previous threats Doan had made to Carrie and the criminal reports filed by Carrie

during the preceding weeks. Plaintiffs contend that Chief Payton responded with the question, "Why does she [Carrie] keep going back to it?" (doc. 1 ¶ 21). Plaintiffs assert that Chief Payton did not investigate Doan, but went instead to Lawrence Baker's home later that day and allegedly warned him that Carrie had been reported missing and that Doan would be a suspect.

Lawrence Baker's home is located within the jurisdiction of Clermont County, and is, therefore, located outside the jurisdiction of Clinton County, and, thus, allegedly outside of the jurisdiction of Chief Payton (*see* docs. 128 & 131).

On September 3, 1996, the Village's police department, along with other law enforcement personnel from surrounding jurisdictions, performed a search of Lawrence Baker's junk yard, which, as stated earlier, was actually located in Clermont County. Specifically, this search was conducted by law enforcement officers from the Clermont County Sheriff's Office, the Brown County Sheriff's Office, and the Village of Blanchester's Police Department. However, according to Plaintiffs, Chief Payton was either the lead law enforcement official on the scene or the officer who was in charge of the actual search of Lawrence Baker's property.

During the September 3, 1996–search, a blood hound and a cadaver dog brought a small pond located on Lawrence Baker's property to the attention of the search team, indicating that the dogs may have detected Carrie's scent. The search team officers allegedly informed Chief Payton that they wanted the pond drained on the Baker Family property, however, Chief Payton inexplicably declined to proceed with the search that day and advised everyone to leave the premises. Lawrence Baker was supposedly present during the search, as well as a witness to its termination. When the pond was drained the next day, footprints were visible on the

bottom of the pond and a muddy path of weeds led away from the pond, which possibly indicated that something or someone was recently removed from the pond, or that someone had recently entered the pond.

Carrie's disappearance was eventually ruled a homicide even though her body was never found. Subsequently, Doan was charged with Carrie's murder. Tracey Baker was charged with obstruction of justice, tampering with evidence, and gross abuse of a corpse. Lawrence Baker was also criminally charged in Carrie's disappearance.

On August 7, 1997, a jury found Doan guilty of aggravated murder with one capital offense specification, and three counts of kidnaping in the Clinton County Court of Common Pleas.[1] He was sentenced to life imprisonment without parole. Tracey Baker's trial began in the Clinton County Court of Common Pleas on May 20, 1998. On June 4, 1998, a jury found Tracey Baker guilty of two counts of obstruction of justice and one count of tampering with evidence. Tracey Baker was found not guilty of gross abuse of a corpse. The trial of Lawrence Baker began in the Clinton County Court of Common Pleas on August 18, 1998. On August 25, 1998, the jury returned three not guilty verdicts against Lawrence Baker.

### C. *Procedural History*

On October 24, 1997, more than a year after Carrie's disappearance, Plaintiffs filed a civil complaint in federal court against Defendants Vincent Doan, Lawrence Baker, Tracey Baker, Richard Payton and the Village of Blanchester, seeking both monetary and injunctive relief (*see* doc. 1). In their Complaint, Plaintiffs claim that Doan's actions toward Carrie were based primarily on account of her gender in violation of the Violence Against

---

1. *See State v. Doan,* No. CR–97–5–077 (Clinton County Ct. of Common Pleas Aug. 7, 1997); *see also State v. Doan,* No. CA–97–12– 014, 2000 WL 221963 (Ohio App. Feb. 28, 2000) (affirming Doan's trial court conviction).

Women's Act of 1994, 42 U.S.C. § 13981 (*Id.*). Furthermore, Plaintiffs assert that the actions of Defendants Vincent Doan, Lawrence Baker, Tracey Baker, and Police Chief Payton "were willful, wanton, malicious, or in reckless disregard or indifferent to the safety of Carrie Culberson and to the peace of mind, rights, including rights of familial association of Debra Culberson, Roger Culberson, and Christina Culberson" (*Id.* ¶ 34). Plaintiffs also claim that Defendants violated their civil rights under 42 U.S.C. § 1983, as protected by the Fourteenth Amendment of the Constitution (*Id.*).

Additionally, Plaintiffs assert state law claims of emotional distress, wrongful death, obstruction of justice, and conspiracy against all Defendants (*Id.*). Shortly thereafter, Defendants filed their Answers asserting a general denial of Plaintiffs' causes of actions and defending with several affirmative defenses in response to Plaintiffs' claims (docs. 2, 3, 7, 8 & 58).

In their Answers, Defendants strongly dispute many of Plaintiffs' material, factual, and legal allegations contained in the Complaint and defend their actions by asserting that they acted reasonably under the circumstances, without malice or fault, and contending that Defendants Doan and Tracy Baker are solely responsible for the tragic death of Carrie Culberson, as well as the resulting and expected grief of Plaintiffs (*Id.*).

As earlier noted, in this action, Plaintiffs seek injunctive relief ordering Defendants to disclose the location of Carrie Culberson's corpse so that she may be given an appropriate burial (doc. 1). In addition, Plaintiffs request compensatory and puni-

tive damages, as well as reasonable attorney fees (*Id.*). The subsequent procedural history of this case in federal court can only be described as complex and lengthy.

On July 1, 1998, Defendant Doan filed a Motion to Dismiss Plaintiffs' Complaint asserting that Count I of the Complaint, "The Violence Against Women's Act," enacted by the Congress was unconstitutional (doc. 12). The civil provisions of the Violence Against Women's Act of 1994 (hereinafter, the "VAWA" or "the Act"), Pub.L. No. 103–322 § 40001–40703, 108 Stat. 1796, 1902–55, provides a claimant with a civil right to be free from crimes of violence motivated by gender and a federal civil rights cause of action for victims of crimes of violence motivated by gender. *See* Title 42 U.S.C. §§ 13981(a)-(c).[2]

In order to establish a cause of action under the VAWA, the claimant must show (1) that she was a victim of a crime of violence and (2) that the crime was motivated based on her gender. 42 U.S.C. § 13981(c). The claimant does not need to show that there has been a prior criminal complaint, prosecution, or conviction against the defendant. 42 U.S.C. § 13981(e)(2).

The Act defines a "crime of violence" as "an act or series of acts that would constitute a felony ... whether or not those acts have actually resulted in criminal charges, prosecution, or conviction," 42 U.S.C. § 13981(d)(2)(A), or acts that would constitute a felony "but for the relationship between" the parties, i.e., marriages in states where laws exist to provide spousal immunity.[3] 42 U.S.C. § 13981(d)(2)(B). Additionally, the Act defines the term "crime motivated by gender" as a crime commit-

---

2. The VAWA provides that "[a]ll persons within the United States shall have the right to be free from crimes of violence motivated by gender." 42 U.S.C. § 13981(b). Although Congress provided both criminal and civil provisions in the VAWA to address acts of violence against women, for the purposes of the instant matter, all references to the Act in this Order are in regards to the civil provisions.

3. For instance, the VAWA provides spousal-victims of crimes of violence in states such as Louisiana and Georgia, whose laws prevent victims from bringing tort claims in state courts because of inter-spousal tort immunity statutes, the ability to bring claims in federal court and seek damages. *Id.*

ted by the defendant "because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender...." 42 U.S.C. § 13981(d)(1).

In our April 8, 1999 Order, this Court joined many other federal courts in holding that the VAWA was indeed constitutional, and, therefore, Plaintiffs' Complaint stated a claim upon which relief could be granted (doc. 56). *See Culberson v. Doan,* 65 F.Supp.2d 701, 714 (S.D.Ohio Apr.8, 1999). On September 4, 1998, Plaintiffs filed a Cross–Motion for Partial Summary Judgment against Defendant Vincent Doan only, alleging that there were no genuine issues as to any material fact and that Plaintiffs were entitled to judgment as a matter of law as to Claim I, violation of the VAWA (doc. 24).

On October 12, 1999, this Court denied Plaintiffs' Motion for Summary Judgment as to Count I, the VAWA, of the Complaint for the following reasons:

'Procedural and discovery differences between the criminal and civil forums coupled with a defendant's dilemma over whether to testify in his own behalf, or present any defense at the criminal trial, make preclusion in this instance a precarious practice and, we believe, unwise practice.' *Phillips,* 113 Ohio App.3d at 382, 680 N.E.2d at 1284; *see also Walden v. State,* 47 Ohio St.3d 47, 51–52, 547 N.E.2d 962, 965–67 (1989) (holding that there are several qualitative differences between criminal and civil actions which 'militate against giving criminal judgments preclusive effect in civil or quasi-civil litigation'). We agree with Plaintiffs in their general position that the Ohio courts have made exceptions, in the interest of justice and fairness, to the mutuality requirement in regards to issue preclusion. However, we must also note that the mutuality requirement, though weakened with exceptions, has not been expressly overruled by subsequent case law or by statute. Plaintiffs all but concede this point in their briefs, but they also plead with this Court to

find in their favor so that 'Carrie Culberson's parents and sister should not be forced to relitigate defendant Doan's guilt' (doc. 32).

(doc. 92); *see also Culberson v. Doan,* 72 F.Supp.2d 865, 873 (S.D.Ohio Oct.12, 1999) (same).

Subsequent to this Court's April 1999 and October 1999 decisions, the United States Supreme Court in the case of *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 1754, 146 L.Ed.2d 658 (2000) found the VAWA unconstitutional finding, in pertinent part:

We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly national and what is truly local. In recognizing this fact, we preserve one of the few principles that has been consistent since the [Commerce] Clause was adopted. The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States.

*Morrison,* 120 S.Ct. at 1754 (internal citations omitted).

Shortly thereafter, Plaintiffs filed a stipulation of dismissal of "all claims against [Defendants] Vincent Doan, Tracey Baker, and Lawrence Baker" (doc. 97). In addition, in the notice of dismissal, Plaintiffs further voluntarily dismissed all claims against Defendants Richard Payton and Village of Blanchester "except the 42 U.S.C. Section 1983 due process claim, the intentional emotional distress claim, and the obstruction of justice claim" (*Id.*). Furthermore, Plaintiffs asserted that all of the Parties to this action were in "agreement to this dismissal" (*Id.*).

#### D. *The Court's Holding*

On September 29, 2000, Defendants filed their Motions for Summary Judgment as-

serting that there are no genuine issues of material fact, and, therefore, they are entitled to judgment in their favor as a matter of law (docs. 128 & 131). Thereafter, Plaintiffs filed their Response (doc. 139), followed by Defendants Replies (docs. 140 & 141). In addition, the Court held a hearing in this matter on November 16, 2000 (doc. 142). This matter is now ripe for the Court's determination.

Before the Court are two Motions for Summary Judgment (docs. 128 & 131). The moving parties consist of two Defendants, the former Police Chief for the Village of Blanchester and the Village itself (doc. 1). Both Motions have been fully briefed and a hearing was held in this matter on November 16, 2000. The non-moving consist of three Plaintiffs who have filed their Response to Defendant's Motions (doc. 139).

Having reviewed this matter and for the reasons stated in the Discussion Section of this Order, as well as our finding that genuine issues of material fact exist in regards to many of the issues in this action, the Court concludes that Defendants' Motions for Summary Judgment should be GRANTED–IN–PART and DENIED–IN–PART (docs. 128 & 131).

The Court's holding did not take into consideration the purported "no contest" plea agreement entered into by Chief Payton, as a result of his official actions that were taken on September 3, 1996 at the Baker Family property, because we believe that issue would be better decided in a motion-in-limine, rather than on a motion for summary judgment. Rather, This Court shall address that issue in the Conclusion Section of this Order, as well as a Scheduling Order for the trial on the merits.

## STANDARD OF REVIEW

The narrow question that we must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Id.* at 321, 106 S.Ct. 2548; *Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 405 (6th Cir. 1992); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Guarino,* 980 F.2d at 405.

As the Supreme Court stated in *Celotex,* the non-moving party must "designate" specific facts showing there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Guarino,* 980 F.2d at 405. Although the burden might not require the non-moving party to "designate" facts by citing page numbers, " 'the designated portions must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.' " *Guarino,* 980 F.2d at 405 (quoting *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990)).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conclusory allega-

tions, however, are not sufficient to defeat a motion for summary judgment. *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir.1990).

## DISCUSSION

### A. *Introduction*

An action under Title 42 U.S.C. § 1983 is supplemental to a common law action arising out of the same factual circumstances and these actions may be pursued simultaneously. *Braley v. City of Pontiac*, 906 F.2d 220, 223 (6th Cir.1990) (citing *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)). What is involved in this case is an alleged deprivation of Plaintiffs' liberty interest without due process of law. This can be analyzed under procedural and substantive due process analyses.

The Plaintiffs, Debra Culberson, individually and as Executrix of the Estate of Clarissa Culberson, Christina Marie Culberson, and Roger Culberson are maintaining this action for federal civil rights and Ohio state law tort damages against the Defendants, Richard Payton and the Village of Blanchester (*see* doc. 1). All Defendants other than Chief Payton and the Village of Blanchester have been dismissed from this action (*see* doc. 97).

In addition, as a result of Plaintiffs' Voluntary Entry of Dismissal filed on December 30, 1999, the only remaining claims against Defendants Payton and the Village are in regards to Plaintiffs' Fourteenth Amendment procedural and substantive due process claims, pursuant to 42 U.S.C. § 1983, and two other Ohio state law claims for intentional infliction of emotional distress and obstruction of justice (*see* docs. 1 & 97).

### 1. *The Parties' Arguments*

In his Motion for Summary Judgment, Defendant Payton asserts that he is entitled to summary judgment on all claims set forth in Plaintiffs' Complaint due to the fact that, with respect to the 42 U.S.C. § 1983 claim, Plaintiffs can show no constitutional violation (docs. 128 & 141). In addition, Defendant Payton maintains that the federal doctrine of qualified immunity bars federal liability against Defendant Payton because his actions or inactions constituted the performance of a discretionary act, and are, therefore, objectively reasonable (*Id.*).

With respect to the Ohio state law claims asserted by Plaintiffs, Defendant Payton defends by pointing out that the claim of obstruction of justice does not give rise to a civil cause of action pursuant to Ohio state law (*Id.*). Furthermore, Defendant Payton counters Plaintiffs' allegations by asserting that he is entitled to Ohio state law immunity under Ohio Rev. Code Ann. § 2744, *et seq.*, as well as the public duty doctrine, because he did not act with a malicious purpose, in bad faith, or recklessly (*Id.*). Lastly, Defendant Payton contends Plaintiffs have put forth no evidence to establish either intentional infliction of emotional distress or obstruction of justice on his part (*Id.*).

Defendant Village of Blanchester adopts the same or similar facts, arguments, and conclusions in their separate Motion for Summary Judgment that Defendant Payton does, except, Defendant Village adds the defense that it cannot be held liable for the actions of Defendant Payton based upon *respondent superior*, and Plaintiffs cannot point to any custom, policy, "deliberate indifference," or procedure that led to their alleged damages based on the Village's action in this case (docs. 131 & 140). In addition, Defendant Village asserts that it has federal and state law immunity in regards to Plaintiffs' remaining claims (doc. 140).

In their Response to Defendants' Motions for Summary Judgement, Plaintiffs assert that there are a number of disputes in regards to the genuine issues of material fact remaining, and, thus, those issues preclude any judgment in favor of Defendants as a matter of law (doc. 139). Plain-

tiffs contend that this action is brought by the family of Carrie Culberson in order to recover the body of Carrie and to secure damages for its deprivation, which, regrettably, has not yet yielded the current location of the body (*Id.*). However, Plaintiffs allege that they do know where the body was on the date of September 3, 1996 (*Id.*).

According to Plaintiffs, this is the date that a search was being conducted by Chief Payton at a junkyard owned by Doan's father, Lawrence Baker (*Id.*). Plaintiffs claim that both a bloodhound and a cadaver dog "hit" on the pond at the junkyard during the search (*Id.*). Plaintiffs' argue that this meant Carrie's body was, more likely than not, present in the pond on that fateful day (*Id.*).

In addition, Plaintiffs maintain that both Lawrence Baker and Chief Payton were aware of the actions by the police dogs, yet, Chief Payton sent all of the law enforcement officers home rather than proceed to immediately search the pond or secure the area with police (*Id.*). Furthermore, Plaintiffs' allege that when the pond was eventually drained the next day, no body was found, however, footprints and markings in the bottom of the pond, as well as the presence of mud on the path leading from the pond allegedly makes it clear that the Baker Family had removed Carrie's body from the pond within that 24–hour period (*Id.*).

Plaintiffs conclude their arguments by charging that the conduct of Chief Payton was so shocking and outrageous because his actions allegedly blocked the Culberson's Family only chance to recover the body of Carrie Culberson (*Id.*). According to Plaintiffs, as a result of Chief Payton's actions, their family has been unable to provide a proper burial for Carrie, and, therefore, they have been unable to bring a proper closure to this tragic loss (*Id.*). Plaintiffs argue that, since this Court has previously held that people have a property right in the bodies of their deceased family members, material facts are clearly at issue making this case one that must be submitted to a jury, and, thus Defendants'

Motions for Summary Judgment must be denied (*Id.*).

## 2. *Rule 56—Plaintiffs' Favorable Facts Reviewed*

Rule 56 of the Federal Rules of Civil Procedure permits this Court to enter summary judgment for Defendants only if there are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law. In determining whether there are genuine issues of material fact for trial, this Court must examine the evidence in the light most favorable to Plaintiffs. With this in mind, the Court believes that we must view the allegations surrounding the September 3, 1996–search of Lawrence Baker's junkyard and pond by Chief Payton in a light most favorable to Plaintiffs. We can summarize those favorable facts as follows.

According to Plaintiffs, based on the fact that the bloodhounds and cadaver dogs "hit" on, or exhibited positive scent reactions to the pond located on Lawrence Baker's property, as well as the information available to him at the time, Chief Payton either knew, suspected, or should have known that Carrie's body was in the pond at the time of the search. By calling off the search, leaving no police to guard the pond, and by waiting a full 24 hours before resuming the search of the Baker Family property, Plaintiffs claim that Chief Payton's reckless or intentional actions caused the loss of Carrie's body forever, and, therefore, Chief Payton was directly responsible for the deprivation of the Culberson Family's property right in the remains of Carrie.

In light of these facts and when those facts are viewed in a light most favorable to Plaintiffs, we will now address the merits of Defendants' Motions for Summary Judgment (docs. 128 & 131).

## B. *Count II—Title 42 U.S.C. Section 1983.*

### 1. *Introduction to Section 1983*

Title 42 U.S.C. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable in an action at law, suit in equity, or other proper proceeding for redress.

*Id.; see also Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 402–403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

■ To establish a claim under § 1983, two elements are required: (1) conduct committed by a person acting under the color of state law that (2) deprives plaintiffs of rights, privileges, or immunities secured by the Constitution or the laws of the United States. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Sargi v. Kent City Board of Educ.,* 70 F.3d 907, 910 (6th Cir.1995).

■ While a municipality may be held liable under 42 U.S.C. § 1983 for a constitutional violation directly attributable to it, § 1983 does not impose vicarious liability on a municipality for the constitutional torts of its employees. *See Monell v. Department of Soc. Servs. of the City of New York,* 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Therefore, in order to state a claim against a city or county under § 1983, a plaintiff must show that his injury was caused by an unconstitutional "policy," "custom," or by "deliberate indifference" in regards to the actions of the municipality. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

■ In regards to the "deliberate indifference" standard, a plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Board of County Comm'rs,* 520 U.S. at 407, 117 S.Ct. 1382 (quoting *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). " '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs,* 520 U.S. at 410, 117 S.Ct. 1382. In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be "plainly obvious." *Id.* at 411, 117 S.Ct. 1382.

Furthermore, a plaintiff ordinarily cannot show that a municipality acted with deliberate indifference without showing that the municipality was aware of prior unconstitutional actions of its employees and failed to respond. *Board of County Comm'rs,* 520 U.S. at 415, 117 S.Ct. 1382; *City of Canton,* 489 U.S. at 390–91, 109 S.Ct. 1197; *Stemler v. City of Florence,* 126 F.3d 856, 865 (6th Cir.1997).

■ As previously stated, a governmental entity may not be held liable under § 1983 for an employee's conduct on the basis of *respondeat superior. Monell,* 436 U.S. at 690–691, 98 S.Ct. 2018. Rather, plaintiffs must show that the governmental entity itself is the wrongdoer. *Collins v. City of Harker Heights,* 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Governmental defendants may not be found liable unless plaintiffs can establish that an officially executed policy, or the tolerance of a custom, leads to, causes, or results in the deprivation of a constitutionally protected right. *Collins,* 503 U.S. at 122–23, 112 S.Ct. 1061.

■ An act performed pursuant to a "custom" not formally approved by an appropriate decision maker may subject a government entity to liability on the theory that the relevant practice is so widespread as to have the force of law. *Board of County Comm'rs,* 520 U.S. at 404, 117 S.Ct. 1382. To show the existence of an offending custom or policy, plaintiffs must

adduce specific facts supporting their claim—conclusory allegations are insufficient. *Taylor v. Canton Police Dep't,* 544 F.Supp. 783, 789 (N.D.Ohio 1982).

In addition to identifying conduct attributable to the government entity (i.e., a governmental policy, custom, or deliberate indifference), a § 1983 plaintiff must also demonstrate that the government entity was the "moving force" behind the injury alleged. *Board of County Comm'rs,* 520 U.S. at 403–04, 117 S.Ct. 1382. That is, plaintiff not only must show that the governmental action was taken with the requisite degree of culpability but also must demonstrate that there exist a direct causal link between the governmental action and the deprivation of federal rights. *Id.* at 404, 117 S.Ct. 1382; *see also Van Hull v. Marriott Courtyard,* 87 F.Supp.2d 771, 779 (N.D.Ohio 2000).

For purposes of these Motions and because none of the Parties to this action have taken a contrary position, the Court will assume that Chief Payton was a "state actor" as of September 3, 2000. The issues are whether there is evidence that a constitutional violation occurred, and, if so, whether there is sufficient evidence to show that a municipal policy, custom, or "deliberate indifference" on the part of Defendants caused the violation of Plaintiffs' rights.

Plaintiffs claim that the Due Process Clause of the Fourteenth Amendment imposed a duty on Chief Payton that he allegedly violated by depriving the Culberson Family of the right to recover and possess the body Carrie Culberson. In fact, Plaintiffs cite to an earlier Order of this Court in regards to this case that purport to recognize their right and the potential violation of that right:

> In this case, we first find that Plaintiffs, being Carrie's next of kin, have a protected property interest in the remains of Carrie's body under the Due Process Clause of the Fourteenth Amendment. *Brotherton v. Cleveland,* 923 F.2d 477, 481 (6th Cir.1991 ) (recognizing that 'the human body is a valuable resource' and that, 'The importance of establishing rights in a dead body has been, and will continue to be, magnified by scientific advancements.'); *see also Whaley v. County of Tuscola,* 58 F.3d 1111, 1114 (6th Cir.1995) (acknowledging the *Brotherton* court's holding that, "the aggregate of rights granted by the state of Ohio to [the next of kin] rises to the level of a 'legitimate claim of entitlement' in the [deceased person's] body, ... protected by the due process clause of the fourteenth amendment," as the law of the Circuit).

(doc. 139) (quoting *Culberson v. Doan,* 65 F.Supp.2d 701, 715–16 (S.D.Ohio 1999)).

## 2. *Procedural Due Process*

■ A cause of action under § 1983 is not available in a case involving deprivation of property without due process of law if there exist an adequate state remedy that comports with procedural due process. *Parratt v. Taylor,* 451 U.S. 527, 543–44, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). The Sixth Circuit in *Wilson v. Beebe,* 770 F.2d 578, 584–85 (6th Cir.1985) extended the rule in *Parratt* to the deprivation of a liberty interest. "The focus in a procedural due process claim, where one has been deprived of life, liberty, or property, is upon what process is due in the event of such a deprivation." *Hilliard v. Walker's Party Store, Inc.,* 903 F.Supp. 1162, 1177 (E.D.Mich.1995). "Merely stating that one has been deprived of a protected interest through an unauthorized government practice is insufficient to state a claim for procedural due process where the plaintiff has available to him state procedures which will provide a remedy for the deprivation." *Hilliard,* 903 F.Supp. at 1177 (citing *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Watts v. Burkhart,* 854 F.2d 839, 843 (6th Cir. 1988)).

In order to state a valid due process claim, a plaintiff must show a deprivation of property under color of state law. *See Brotherton v. Cleveland,* 923 F.2d 477, 479 (6th Cir.1991). A plaintiff must also show that: (1) the conduct was caused by an "established state procedure rather than random and unauthorized action"; or (2) the means of redress for property deprivations provided by the State of Ohio fails to satisfy the requirements of procedural due process. *Brotherton,* 923 F.2d at 479 (citing *Parratt,* 451 U.S. at 537, 101 S.Ct. 1908).

Plaintiffs rely on *Brotherton* in order to show that they have alleged a deprivation of a property right under color of state law. In *Brotherton,* a man's family alleged that there was a violation of their procedural due process rights because the man's corneas were removed by the county coroner without the man's consent, or without the consent of the decedent's surviving next of kin. *Id.,* 923 F.2d at 478.

Specifically, in *Brotherton,* Dr. Cleveland, the Hamilton County Coroner, removed the corneas from dead bodies pursuant to an internal policy and procedure by the Coroner's Office to remain deliberately ignorant of the wishes of the deceased's next of kin. *Id.* This policy was derived from an interpretation of Ohio law. *Id.*

The Sixth Circuit ruled that the next of kin had a protected property interest in the dead bodies in light of the rights granted by Ohio law, and, because of the removal of the corneas, pursuant to the corner's policy of removing the corneas without a predeprivation hearing. *Id.* at 481–82. In the case at bar, Defendants argue that Plaintiffs have not shown that the deprivation was caused by an "established state procedure" and was not a random or unauthorized act on the part of Chief Payton, as was clearly the case in *Brotherton. Id.,* 923 F.2d at 482; *see also Parratt,* 451 U.S. at 535, 101 S.Ct. 1908.

A majority of the courts confronted with the issue of whether a property interest can exist in a dead body have found that a property right of some kind does exist and often refer to it as a "quasi-property right." *See, e.g., Brotherton v. Cleveland,* 173 F.3d 552, 556 (6th Cir.1999) ("In 1991, this court decided *Brotherton* I, in which we reversed the district court, reaching only the due process issue. We explained that [Deborah] Brotherton had a property interest in Steven's [Brotherton] body, that Ohio failed to provide necessary predeprivation procedures, and that 'the policy and custom of the Hamilton County coroner's office are an established state procedure necessitating predeprivation procedures.'") (citing *Brotherton* I, 923 F.2d at 479); *Whaley v. County of Tuscola,* 58 F.3d 1111, 1114 (6th Cir.1995) ("Because *Brotherton* [I and II] is the law of this Circuit, our decision in the present case turns on a comparison of Ohio and Michigan law. If Michigan recognizes the same basic rights in a deceased person's body as Ohio, then *Brotherton* [I and II] controls.... After reviewing Ohio and Michigan law, we conclude that they are in substance the same regarding the next of kin's rights in a deceased relative's body. If anything, Michigan is even more explicit than Ohio in its acknowledgment of these rights."); *Soliday v. Miami County,* No. C–3–91–153, 1993 WL 1377511, at *9 (S.D.Ohio Nov.22, 1993) ("Based upon the Sixth Circuit's decision in *Brotherton* I, this Court concludes that the Plaintiff has stated a constitutional claim for the deprivation of property without due process of law, in violation of the Fourteenth Amendment."); *Arnaud v. Odom,* 870 F.2d 304, 308 (5th Cir.1989) ("Louisiana has indeed established a 'quasi-property' right of survivors in the remains of their deceased relatives."); *Fuller v. Marx,* 724 F.2d 717, 719 (8th Cir.1984) ("Under Arkansas law, the next of kin does have a quasi-property right in a dead body."); *In re Estate of Moyer,* 577 P.2d 108, 110 n. 5 (Utah 1978) (same).

■ The Court agrees with Defendants in that Plaintiffs have not offered any evi-

dence that Chief Payton or the Village of Blanchester had an established internal office policy or procedure of abandoning criminal investigations, intentionally or recklessly assisting criminal suspects in their disposal of evidence, or depriving the citizens of the Village of Blanchester of their constitutionally protected property right to recover the remains of their deceased relatives.

"Where a plaintiff fails to provide evidence that the alleged conduct was anything other than a random unauthorized act, the plaintiff must show that the means provided by the state to remedy the conduct are inadequate." *Barrett v. Outlet Broadcasting, Inc.,* 22 F.Supp.2d 726, 743 (S.D.Ohio 1997). In addition to this procedural due process claim, Plaintiffs have brought a federal substantive due process claim, as well as state law claims against Defendants in order to redress Defendants' actions. Plaintiffs have not shown that these causes of actions and/or a post-deprivation hearing will not address the injuries they suffered as a result of Defendants' alleged conduct.

Furthermore, Plaintiffs' argument that Chief Payton should have held a pre-deprivation hearing before deciding to leave the pond on September 3, 1996 is totally impractical, has no support in the law and the Constitution does not require such a radical result, even when Plaintiffs' facts are viewed in its most favorable light.

Having reviewed this matter, the Court finds that Plaintiffs' substantive due process and/or state law claims asserted in their Complaint may provide an adequate remedy to Plaintiffs for the conduct that was allegedly engaged in by Chief Payton and the Village of Blanchester. Therefore, this Court finds that Plaintiffs' procedural due process claim must fail as there exist adequate state law procedures, such as Plaintiffs' state law claims for damages, in order to guarantee due process for any injury sustained as a result of Defendants' alleged conduct in this matter. Accordingly, Defendants' Motions for Summary

Judgment are GRANTED (docs. 128 & 131) in regards to Plaintiffs' procedural due process claim as alleged in COUNT II of the Complaint (*see* doc. 1).

### 3. *Substantive Due Process*

 The claimed constitutional basis for liability in this case is the Due Process Clause of the Fourteenth Amendment, which provides that, "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." In general, state officials are not constitutionally obligated to protect members of the public at large from crime. *See DeShaney v. Winnebago County of Dep't of Soc. Servs.,* 489 U.S. 189, 195–97, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *Martinez v. California,* 444 U.S. 277, 284–85, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980); *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 700 (9th Cir. 1988); *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982); *Was v. Young,* 796 F.Supp. 1041, 1045 (E.D.Mich.1992).

This is because "the Constitution is a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services; even so elementary as maintaining law and order." *Bowers,* 686 F.2d at 618. The Supreme Court has observed:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. . . . As a general matter, then, we conclude that a State's failure to protect an individual against private

violence simply does not constitute a violation of the Due Process Clause.

*DeShaney,* 489 U.S. at 195–197, 109 S.Ct. 998 (internal citations omitted).

In other words, "the due process clause is not usually implicated by government inaction, but rather by government action." *Was,* 796 F.Supp. at 1045. Thus, the most frequent situation in which a constitutional deprivation occurs is when a state official himself takes an affirmative action to violate the protected right. *See, e.g., Screws v. United States,* 325 U.S. 91, 111, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (finding, for example, when local law enforcement officials themselves beat a citizen to death, those officials took an affirmative action to violate that citizen's constitutional rights).

Other cases, both pre- and post-*DeShaney,* have focused on the concept of "state custody" for purposes of § 1983 liability. "The courts have considered the parameters of the state's responsibility for persons in actual custody, i.e., prisons, and have also attempted to define the limits of 'functional custody,' where the State has exercised some degree of control or restriction, which is less complete than that in a police station or prison." *Was,* 796 F.Supp. at 1046. "One primary situation where courts have found 'functional custody' is where a child who has been placed in a foster home by the state is mistreated by his or her foster parents." *Id.* at 1046; *see also Meador v. Cabinet for Human Resources,* 902 F.2d 474, 476 (6th Cir.1990) (holding that "due process extends the right to be free from the infliction of unnecessary harm to children in state-regulated foster homes.").

In finding a constitutional duty to protect for purposes of § 1983 liability, these courts analogize to the Supreme Court case of *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (finding that the Eighth Amendment requires States to attend to prisoner's serious medical needs). *See, e.g., Youngberg v. Romeo,* 457 U.S. 307, 314, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (finding that involuntari-

ly committed mental patients have substantive rights to personal security under the Due Process Clause); *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244–45, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (finding that the Due Process Clause requires States to provide medical care to suspects in police custody). The rationale behind this principle is basically that:

> when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to provide for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his behalf.

*DeShaney,* 489 U.S. at 200, 109 S.Ct. 998 (citing *Estelle,* 429 U.S. at 103, 97 S.Ct. 285).

██ Violations of substantive due process can be one of two kinds: "(1) deprivation of a particular constitutional guarantee ... or (2) actions that 'shock the conscience.'" *Braley,* 906 F.2d at 224–25 (citing *Wilson v. Beebe,* 770 F.2d 578, 585–86 (6th Cir.1985)); *Fluellen v. United States,* 816 F.Supp. 1206, 1213 (E.D.Mich. 1993) ("A substantive due process claim must be based either upon a violation of an explicit constitutional guarantee, such as a Fourth Amendment violation, or behavior that shocks the conscience.") (citing *Braley,* 906 F.2d at 224–25).

### a. *DeShaney and Constitutional Guarantees*

In *DeShaney v. Winnebago County,* the United States Supreme Court addressed the claims of a child who sustained injuries

inflicted by his natural father after the defendant state agency returned him to the father's custody. *Id.*, 489 U.S. at 191, 109 S.Ct. 998. The Supreme Court held that a governmental entity has no obligation under the Due Process Clause of the Fourteenth Amendment to protect citizens from the violent acts of private persons such as the child's father. *Id.* at 200–201, 109 S.Ct. 998; *see also Reed v. Knox County Dep't of Human Servs.*, 968 F.Supp. 1212, 1216 (S.D.Ohio 1997).

The Supreme Court went on to note that a duty to protect on the part of the State may arise where a "special relationship" exists between the individual and the State, such as in the case of prison inmates and persons confined to mental institutions. *Id.* at 198–200, 109 S.Ct. 998. However, such a relationship arises only where "the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs." *Id.* at 200, 109 S.Ct. 998.

"The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitations which it imposed on his freedom to act on his own behalf." *Id.; see also Foy v. City of Berea*, 58 F.3d 227, 231 (6th Cir.1995) (finding that the mere knowledge of danger to plaintiff does not create an affirmative duty to protect). "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraints of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, [and] not its failure to act to protect his liberty interests against harms inflicted by other means." *DeShaney*, 489 U.S. at 200, 109 S.Ct. 998.

The Supreme Court concluded that the harm suffered by the child occurred while he was in the custody of his father, not in the custody of the State, and that the State agency had no constitutional duty to protect the child even though it may have been aware of the dangers he faced. *DeShaney*, 489 U.S. at 201, 109 S.Ct. 998; *see also Reed*, 968 F.Supp. at 1217.

The Supreme Court in *DeShaney* further observed that the conduct of the agency may have lead to the creation of a duty on its part to protect the child against danger under state tort law. *DeShaney*, 489 U.S. at 201–202, 109 S.Ct. 998. However, the Court went on to note that the Due Process Clause of the Fourteenth Amendment "does not transform every tort committed by a state actor into a constitutional violation." *Id.* at 202, 109 S.Ct. 998. The Court found that, because the state agency had no constitutional duty to protect the child against his father's violence, the agency's failure to do so did not constitute a violation of the Due Process Clause. *Id.; see also Reed*, 968 F.Supp. at 1217.

■■■ This Court believes that the proper result in this case in regards to Plaintiffs' substantive due process claims is, therefore, governed by the general rule of *DeShaney* in that, absent some special relationship between the State and the victim, such as when the State restrains the victim's freedom (i.e., prison, mental institution, etc.), the Due Process Clause does not impose liability for private acts of violence. *Id.*, 489 U.S. at 197, 109 S.Ct. 998; *Foy*, 58 F.3d at 230–31. Rather, "[t]he State must take some action which places the victim in a dangerous position, or increases the potential danger, or deprives the victim of his or her ability to use self-help." *Smith v. City of Elyria*, 857 F.Supp. 1203, 1210 (N.D.Ohio 1994).

We find the following version of the facts as alleged by Plaintiffs in their Response does present a genuine issue of material fact which precludes judgment as a matter of law for Defendants on this issue:

[Chief] Payton made a deliberate choice not to secure Carrie Culberson's body when he learned her body was in the Baker pond. He made this choice knowing the risk of not securing her body was obvious—the evidence would be tampered with and her body would be removed. He further made the decision not to secure Carrie's body knowing that he was depriving her family of its right to her body. Furthermore, the Culberson family was dependent on the [V]illage of Blanchester. They had no access to the body while it was in the pond. Carrie's body was on private property. In fact, the Culberson family, afraid Carrie was being held at gun point in a barn or tied up and left to die in a barn, as Doan had threatened to do to her days earlier, went searching in every barn they could find, including the one at the Baker Hunt Road junkyard. However, [t]he Culberson's were warned not to trespass on the Baker junkyard. The Culberson's were therefore totally dependent on the Blanchester Police to recover Carrie's body from the junkyard. The Blanchester [P]olice, headed by [Chief] Payton, did search at the junkyard on September 3, 1996, [and] the Blanchester police had control of Carrie's body because they had control of the junkyard pond and immediate area.

(doc. 139) (citing *Michigan v. Summers*, 452 U.S. 692, 702–703, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (suggesting that police in conducting proper searches exercise "unquestioned command" of the situation, including the ability to detain persons from leaving the premises during the search)).

Defendants seek to defend against Plaintiffs' substantive due process claims by invoking the rule of *DeShaney*. We disagree. Plaintiffs have alleged sufficient facts in order to present a genuine issue of material fact as to whether Chief Payton deprived Plaintiffs of their ability to use self-help, made Plaintiffs more vulnerable to the danger that Carrie's body would be removed from the pond, or took on an affirmative duty to prevent harm to Carrie and Plaintiffs by taking actual control of the crime scene at the Baker Family junkyard and pond.

Therefore, the Court concludes that, Chief Payton was in "constructive control" of, or, in the alternative, had "functional custody" of Carrie's body. Moreover, in light of Plaintiffs' facts, we also conclude that Plaintiffs have put forth sufficient facts for a reasonable trier of facts to conclude that Chief Payton abandoned his duty as one of the lead law enforcement officer on the scene in order for her body to be removed from the pond and be secreted away from her family by either Doan alone, or with the help of others.

The Third Circuit used the concept of "functional custody" to uphold a § 1983 claim where a police officer, in accordance with a municipal policy of deferring to private clubs to investigate internal thefts, left an employee who was suspected of a theft in the owner's custody pending investigation of the crime. *Horton v. Flenory*, 889 F.2d 454 (3rd Cir.1989). The owner of the club was an ex-police officer well-known to the defendants. *Horton*, 889 F.2d at 454. The investigating officer did not take the victim out of the club, despite the victim's request for protection, stating that he felt that the victim "was in good hands." *Id.* at 457.

The Third Circuit rejected the defendants' arguments that, under *DeShaney*, there are no circumstances in which a municipality or a police officer has an obligation to protect persons from private violence. *Id.* Rather, the *Horton* court stated that the holding in *DeShaney* "is limited to situations in which the state is not involved in the harm, either as a custodian or as an actor." *Id.* The court found sufficient evidence in order to permit a finding that the plaintiff was in state custody at the time of his fatal beating. *Id.* at 458.

The Third Circuit then distinguished *DeShaney* stating, "[u]nlike the passive role of the neglectful social workers in *DeSha-*

*ney*, the role of the state actor here, [the investigating officer] could be found from the evidence to be anything but passive". *Horton*, 889 F.2d at 458. We find the holding of *Horton* to be applicable to the case at bar in several respects that we will address in a moment.

But, as a starting point, we thought it was important to note, that this Court finds the following arguments by Defendant Payton to be somewhat disingenuous, contradictory, and unrealistic:

> In addition, to the fact that defendants owed no duty, defendants did not prevent plaintiffs from recovering the body. First and foremost, it was Vincent Doan who murdered and concealed the body from plaintiffs. Second, it was Lawrence Baker, the owner of the junk yard property situated in Clermont County, who prohibited plaintiffs from entering upon his private property to search for the body, and not any action by defendants.

(doc. 141 at 14 n. 14). The record before us clearly disputes Chief Payton's assertions.

Specifically, Plaintiffs counter in their Response that the Culberson Family was warned not to trespass on the Baker Family junkyard property, and, therefore, Plaintiffs were totally dependent on the Village of Blanchester Police Department to recover Carrie's body from that property. Second, on September 3, 1996, Chief Payton had law enforcement officers deployed at the scene with the consent of the property owner and had established a law enforcement perimeter around the pond.

Third, according to Plaintiffs, Chief Payton was indirectly warned by Doan and Lawrence Baker that evidence linking Doan to Carrie might be found at the pond or that something incriminating might already be "planted" there. In addition, it is also alleged by Plaintiffs that, Chief Payton made a policy decision to discharge the officers and return possession, control, and custody of the pond and the body within the pond to Doan and the Baker Family.

It is precisely because of the fact that we found law enforcement officers in general, and Chief Payton in particular, were in complete control of the potential crime scene during the search of Lawrence Baker's property on September 3, 1996, that Chief Payton's assertions to the contrary are disingenuous. Therefore, we find that it was Chief Payton, not the Culbersons themselves or the Baker Family, who denied Plaintiffs access to the possible crime scene, as well as the possible remains of Carrie on Lawrence Baker's property.

If Plaintiffs' facts are viewed in a favorable light, it is also reasonable to conclude that, because Chief Payton had "complete control" of the potential crime scene, he also had "constructive and functional" possession, control or custody of Carrie's body. By potentially abandoning that control, custody or possession to her murderer and the Baker Family, we conclude that Chief Payton's actions may have violated Plaintiffs' substantive due process.

Having reviewed this matter, we find that there exist genuine issues of material facts which prevent this Court from finding in favor of Defendants on the issue of the possible constitutional violations of Plaintiffs' substantive due process. Accordingly, Defendants' Motions for Summary Judgment are DENIED (docs. 128 & 131) in regards to Plaintiffs' constitutional guarantee and the substantive due process claims as alleged in COUNT II of the Complaint (*see* doc. 1).

**b.** ***The Supreme Court's "Shock the Conscience Test"***

The Supreme Court has held that, "[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). The Sixth Circuit has described substantive due process as "the right to be free from state intrusions into realms of personal

privacy and bodily security through means so brutal, demeaning, and harmful as literally to shock the conscience" of a court or a trier of fact. *Lillard v. Shelby County. Bd. of Educ.*, 76 F.3d 716, 725 (6th Cir. 1996).

For almost 50 years now the Supreme Court has spoken of the cognizable level of executive abuse of power as that which "shocks the conscience." The Court first put this to the test in the case of *Rochin v. People of California*, 342 U.S. 165, 172–73, 72 S.Ct. 205, 96 L.Ed. 183 (1952), where they found that the forced pumping of a suspect's stomach in order for the police to retrieve illegal-ingested drugs from the suspect's stomach was enough to offend due process as conduct that "shocks the conscience," and violated the "decencies of civilized conduct."

In the intervening years, the Supreme Court has adhered to *Rochin*'s benchmark. *See, e.g., Breithaupt v. Abram*, 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) (reiterating that conduct that "'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency" would violate substantive due process); *Whitley v. Albers*, 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (same); *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("So called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience.'") (quoting *Rochin*, 342 U.S. at 172, 72 S.Ct. 205 and *Palko v. Connecticut*, 302 U.S. 319, 325–26, 58 S.Ct. 149, 82 L.Ed. 288 (1937)).

In the case of *Collins v. City of Harker Heights*, 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), the Supreme Court said once again that the substantive component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *See also County of Sacramento v. Lewis*, 523 U.S. 833, 847, 118

S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (same).

Plaintiffs argue that they do not have to show an established state procedure, like in *Brotherton v. Cleveland,* because Defendants' alleged actions, if assumed to be true, are so outrageous as to shock the conscience of this Court, and, thus, constitutes a violation of substantive due process. *See Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *see also United of Omaha Life Ins. Co. v. Solomon,* 960 F.2d 31, 35 (6th Cir.1992). Plaintiffs assert the following facts found in their Response in support of their allegations that Chief Payton's actions are considered "shocking to the conscience":

> [Chief] Payton knew that [P]laintiffs were desperately searching for Carrie. Debbie Culberson was calling him constantly. The family was organizing hundreds of people to participate in search parties. Chief Payton knew that only he could protect the interest of the family in Carrie's body while it was on private land. He also knew that Carrie's body was in the pond on September 3, 1996. [Chief] Payton had been warned by the murderer and his father that evidence linking Doan to Carrie might be found at the pond. Doan and Lawrence Baker claimed to be worried that something would be "planted" there. Every law enforcement witness asked the question, agreed that a reasonable law enforcement officer would have secured the site after the dogs hit until the pond was drained.... In effect, when Payton released control of the pond, he returned the body of Carrie Culberson to her murderer. Payton's conduct shocks the conscience.

(doc. 139) (citing *Barrett v. Outlet Broadcasting,* 22 F.Supp.2d 726, 738–39 (S.D.Ohio 1997)) (denying summary judgment to law enforcement officers who permitted a television news crew to enter a suicide victim's home, disturb the deceased's corpse and items in her bedroom,

and film her body and suicide scene on national television).

We agree with Plaintiffs' premise that, if for the moment one assumes these facts as alleged to be true, then a reasonable fact finder could find Chief Payton's actions to be indeed "shocking to the conscience" of the Court and a constitutional violation.

Having reviewed this matter, the Court finds that the "shocks the conscience" test is applicable to Chief Payton's alleged conduct, and that Chief Payton's alleged intentional or reckless actions in allowing the pond in question to be unguarded for 24 hours, in order to allow the Baker Family or Doan enough time to permanently remove and secrete Carrie's body, are sufficiently brutal, demeaning, and harmful as to "shock the conscience" of this Court. This Court, therefore, holds that Plaintiffs have stated a claim under the "shocks the conscience" test contained in the Substantive Due Process Clause of the Fourteenth Amendment. Accordingly, Defendants' Motions for Summary Judgment are DENIED (docs. 128 & 131) in regards to Plaintiffs' "shock the conscience and substantive due process claims as alleged in Count II of the Complaint".

### 4. *Municipal Liability*

■ Unlike States, municipal corporations and local governments are "persons" within the meaning of 42 U.S.C. § 1983, and are not, therefore, wholly immune from suit. *See Monell v. Department of Soc. Servs. of City of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

■ A governmental entity may not be held liable under § 1983 for an employee's conduct on the basis of *respondeat superior*. *Monell*, 436 U.S. at 691, 98 S.Ct. 2018. Rather, plaintiffs must show that the government entity itself is the wrongdoer. *Collins v. City of Harker Heights*, 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). A claim against a governmental employee is actually a claim against the

governmental entity itself if the employee is sued in his official capacity. *See Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Such a claim is, thus, subsumed in the claim against the governmental entity, and cannot be maintained independently. *Graham*, 473 U.S. at 165, 105 S.Ct. 3099.

In contrast, "personal-capacity suits" seek to impose personal liability upon a government official for actions the official takes under color of state law. *See Scheuer v. Rhodes*, 416 U.S. 232, 237–38, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). On the other hand, official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018; *see also Graham*, 473 U.S. at 165–66, 105 S.Ct. 3099.

■ As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than the name, to be treated as a suit against the entity. *Brandon v. Holt*, 469 U.S. 464, 471–472, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). Thus, while an "award of damages against an official in his personal capacity can be executed against the official's personal assets, a plaintiff seeking to recover on a judgment in an official-capacity suit must look to the government entity itself." *Graham*, 473 U.S. at 165–66, 105 S.Ct. 3099.

A municipality may be sued for monetary, declaratory, or injunctive relief under 42 U.S.C.1983, where the action that is alleged to be unconstitutional either (1) implements or executes a policy, ordinance, regulation, or decision officially adopted and promulgated by the municipality, or (2) results from governmental "custom or usage" that has become so settled as to have the force of law. *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018; *Jacobs v. Village of Ottawa Hills*, 111 F.Supp.2d 904, 914–15 (N.D.Ohio 2000).

As stated earlier, in order to establish a claim under § 1983, two elements are required: (1) conduct committed by a person acting under the color of state law that (2) deprives plaintiffs of rights, privileges, or immunities secured by the Constitution or the laws of the United States. *Gomez v. Toledo,* 446 U.S. 635, 638, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Sargi v. Kent City Board of Educ.,* 70 F.3d 907, 910 (6th Cir.1995).

While a municipality may be held liable under 42 U.S.C. § 1983 for a constitutional violation directly attributable to it, § 1983 does not impose vicarious liability on a municipality for the constitutional torts of its employees. *See Monell,* 436 U.S. at 692, 98 S.Ct. 2018. Therefore, in order to state a claim against a city or county under § 1983, a plaintiff must show that his injury was caused by an unconstitutional "policy" or "custom" of the municipality. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

Government defendants may not be found liable unless plaintiffs can establish that an officially executed policy, or the tolerance of a custom, leads to, causes or results in the deprivation of a constitutionally protected right. *Id.* An act performed pursuant to a "custom" not formally approved by an appropriate decision maker may subject a government entity to liability on the theory that the relevant practice is so widespread as to have the force of law. *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). To show the existence of an offending custom or policy, plaintiffs must adduce specific facts supporting their claim; conclusory allegations are insufficient. *Taylor v. Canton Police Dep't,* 544 F.Supp. 783, 788 (N.D.Ohio 1982).

In *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Court described the term "policy," as one referring to "formal rules or understanding—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur,* 475 U.S. at 480–81, 106 S.Ct. 1292. While "policy" generally connotes a rule of general application, a decision "tailored to a particular situation" may also constitute a "policy" if made by the proper municipal decision maker. *Id.* at 481, 475 U.S. 469.

Finally, the Supreme Court has made it clear that the identification of policymaking officials is a question of state law requiring the examination of local ordinances and regulations in order to determine the official or body that has the responsibility for making law or setting policy in any given area. *St. Louis v. Praprotnik,* 485 U.S. 112, 124, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). The Court has acknowledged, however, that state law will not "always speak with perfect clarity" on the subject. *Id.* at 125, 108 S.Ct. 915. It has recognized that the authority to make municipal policy may be granted directly by legislative enactment or delegated by the person possessing such authority. *Pembaur,* 475 U.S. at 483, 106 S.Ct. 1292.

The *Pembaur* decision was further explained by the Supreme Court in *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). In addition to identifying conduct attributable to the government entity (i.e., a governmental custom or policy), a § 1983 plaintiff must also demonstrate that the government entity was the "moving force" behind the injury alleged. *Board of County Comm'rs,* 520 U.S. at 408, 117 S.Ct. 1382. That is, plaintiff not only must show that the governmental action was taken with the requisite degree of culpability, but also must demonstrate a direct causal link between the government action and the deprivation of federal rights. *Id.* at 408–409, 117 S.Ct. 1382; *see also Van Hull v. Marriott Courtyard,* 87 F.Supp.2d 771, 779 (N.D.Ohio 2000).

In *Board of County Comm'rs*, the Supreme Court made clear that a policy giving rise to liability cannot be established merely by identifying a policymaker's conduct that is attributable to the municipality. *Id.*, 520 U.S. at 404, 117 S.Ct. 1382. The plaintiff must also demonstrate that, through its deliberate conduct, a municipality was the "moving force" behind the injury alleged. *Id.* at 404, 117 S.Ct. 1382. The Supreme Court explained in *Board of County Comm'rs*, that the Court has recognized a § 1983 cause of action based on a single decision attributable to a municipality only where the evidence that the municipality had acted and that the plaintiff had suffered a deprivation of federal rights also proved fault and causation. *Id.* at 405, 117 S.Ct. 1382 (citing *Pembaur*, 475 U.S. at 481, 106 S.Ct. 1292).

In sum, for a municipality to be liable under § 1983, several factors must be present: (1) the municipality must itself be responsible by either sanctioning or ordering the claimed constitutional violation; (2) the municipal actors must have "final" policymaking authority under state or municipal law (or have been delegated such) for that particular area of the city's business; and (3) the action taken must be pursuant to some policy adopted by the municipal actors exercising their policymaking authority. *See Board of County Comm'rs*, 520 U.S. at 404–405, 117 S.Ct. 1382; *Pembaur*, 475 U.S. at 481–83, 106 S.Ct. 1292.

A municipal or governmental "policy need not be an official order from the municipality's legislative body or agencies in order to justify municipal liability under § 1983." *Johnson v. City of Detroit*, 944 F.Supp. 586, 598 (E.D.Mich. 1996). The single decision of an individual with final authority to establish municipal policy can be sufficient to justify municipal liability. *Pembaur*, 475 U.S. at 480, 106 S.Ct. 1292 (citing *Monell*, 436 U.S. at 694, 98 S.Ct. 2018); *Alioto v. City of Shively*, 835 F.2d 1173, 1175 (6th Cir.1987). Additionally, liability may be founded upon a custom of the municipality, even if not officially approved by the municipality, or a policy of inadequate training or supervision. *Pembaur*, 475 U.S. at 483–84 n. 10, 106 S.Ct. 1292; *City of Canton v. Harris*, 489 U.S. 378, 388–89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

State law (including local law) governs the determination as to who has final policymaking authority. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598. "As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury." *Jett*, 491 U.S. at 737, 109 S.Ct. 2702. As Chief of Police in the Village of Blanchester, Plaintiffs assert that Chief Payton was the executive head of the police department, and, thus, set the policy within the department. *See* Ohio Rev.Code Ann. § 737.19, "Powers and Duties of Marshal; Control of Personnel."

"[A]n unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Praprotnik*, 485 U.S. at 123, 108 S.Ct. 915; *Stone v. Holzberger*, 807 F.Supp. 1325, 1335 (S.D.Ohio 1992) (Spiegel, J.) (same). Of course the policymakers must have the authority to make final policy. *Id.* at 127; *Stone*, 807 F.Supp. at 1335.

For example, Defendants direct the Court's attention to the following legal proposition:

When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymaker's, they have retained the authority to measure

275

the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final. *Stone*, 807 F.Supp. at 1335.

The Village of Blanchester relies on this language to contend that, because Chief Payton's actions allegedly violated the law, he is not making final policy because a higher authority (the Village policymakers or other elected officials) has constrained Chief Payton's allegedly illegal actions. We find that such reliance is misplaced under the facts and circumstances of this case.

Under Ohio law, Chief Payton is the highest elected official in the Village of Blanchester who makes policy for the Village's police department in regards to the discharge of his office and the discharge of his duties. *See* Ohio Rev.Code Ann. § 737.19; *see also Pembaur*, 475 U.S. at 484–85, 106 S.Ct. 1292. Accordingly, Chief Payton possesses final authority in the discharge of his duties, and, thus, any decisions made in the course of discharging his duties constitutes Village policy, and, therefore, the Village is liable for actions taken pursuant to those decisions. *Stone*, 807 F.Supp. at 1336.

The undisputed facts reveal, Ohio state law clearly establishes that the Village of Blanchester's Police Chief, Defendant Payton, as the chief law enforcement officer of the Village with the power to "suppress all ... breaches of the peace ... [and the duty] to arrest any person in the act of committing any offense against the laws of the state of the ordinances of the village." Ohio Rev.Code Ann. § 737.19(C). In addition, in the Village of Blanchester, Plaintiffs allege that Chief Payton wrote the police procedure manual which describes the chief as the executive head of the police department (doc. 139, Ex. B).

Finally, it is also undisputed that Chief Payton was one of the law enforcement officers, if not the lead officer, spearheading the investigation into the initial disappearance and subsequent murder of Carrie Culberson. Therefore, we make an initial determination that Chief Payton was the final decision maker in matters of criminal investigations.

The decision to abandon the pond and leave it unsecured was a course of action consciously chosen from among various alternatives. *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). According to Plaintiffs' allegations, Chief Payton either knew, should have known, or recklessly disregarded evidence that suggested Carrie was in the pond on September 3, 1996. Moreover, Plaintiffs' Response includes numerous alleged instances of Chief Payton either ignoring or minimizing the Culberson Family's concerns in regards to domestic physical abuse by Doan upon Carrie (doc. 139).

While at the same time Plaintiffs allege that Chief Payton went out of his way to either appease, inform, or befriend Doan and the Baker Family, despite the fact that Doan and the Baker Family were suspected of being involved in organized crime, as well as other illegal or questionable activity. Nonetheless, according to Plaintiffs, the Village allegedly did nothing to take action to reprimand Chief Payton or protect the community and its citizens from Doan and the Baker Family (*see* doc. 139 at 6). *See Hubbard v. City of Middletown*, 782 F.Supp. 1573, 1579 (S.D.Ohio 1990) ("The evidence, viewed in favor of the non-moving plaintiff, indicates that the City acquiesced in Dwyer's behavior. Former City Manager William Burns stated in his deposition that he approached City Commissioner Gary Kaup in 1987 with concerns of Dwyer's sexual harassment and involvement with involuntary sexual relationships, and Kaup responded that such behavior had been taking place for years but the City did not desire to take action to stop him.").

Plaintiffs also assert that, not only had Chief Payton been personal friends with the Baker Family for more than 20 years, but that the police department had contracted solely with Lawrence Baker's towing business for official police towing in the Village (doc. 139 at 6). Specifically, in their Response, Plaintiffs allege that prior to Carrie's death, Chief Payton had expressed fear of Doan and the Baker Family and refused to pursue charges against Doan when he was accused of domestic abuse against Carrie (doc. 139, at 7–8).

For example, Plaintiffs allege that Chief Payton's first response when he was notified by Plaintiffs that Carrie was missing was to give an early warning to Lawrence Baker, father of Doan. In addition, Plaintiffs contend that Chief Payton failed to seriously investigate Carrie's disappearance and suspected murderer for several days. Moreover, Plaintiffs argue that it is precisely because of Chief Payton's friendship with Doan and the Baker Family that he called off the search of the pond where Carrie's body was believed to be secreted in order to give his "friends" an opportunity to remove the evidence.

As we have already noted above, the body of Carrie Culberson has never been located. Finally, Plaintiffs assert that during the subsequent months after Carrie's disappearance, Doan and his family have been accused of intimidating witnesses, yet Chief Payton never pursued any investigation into this alleged harassment.

The Complaint concludes that, "[D]efendants Payton and Village of Blanchester have acted pursuant to a policy of denying women who are the victims of domestic violence police protection on an equal basis based on their gender" (doc. 139). While it is true that all of Plaintiffs' proposed factual scenario may be rejected by a trier of fact, it is also true that Chief Payton's actions, as alleged by Plaintiffs in their Complaint and Response, does present genuine issues of material fact that cannot be decided in favor of Defendants as a matter of law.

Thus, under *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) and Ohio state law, this Court finds Chief Payton is the policymaker for the Village of Blanchester regarding his duties as the municipality's top law enforcement officer and any official actions representing deliberate indifference, a policy or a custom that is promulgated by him, is held to be a policy or custom of the Village of Blanchester, for which liability can be imposed on it

■ Having concluded that Chief Payton's actions were the policies or customs of the Village of Blanchester, this Court must determine if a genuine issue of material fact exists as to whether that policy or custom was the "moving force" of the alleged constitutional violation. We find the answer to that question under the factual scenario alleged by Plaintiffs is answered in the affirmative.

Because Chief Payton was the chief law enforcement official with respect to the Village of Blanchester and the search of Lawrence Baker's junkyard/pond on September 3, 1996, his actions were policies of the Village of Blanchester. *See Soliday,* 1993 WL 1377511, at *8. Moreover, those policies were not just the "moving force" of the alleged constitutional deprivation, but they were the alleged deprivation. *Id.*

Of course, Plaintiffs will have to prove at trial that the actions of Chief Payton and the Village of Blanchester deprived Plaintiffs of their constitutional right to Carrie Culberson's body on September 3, 1996 and that such deprivation was the direct and proximate cause of the damages they claimed to have suffered. *Id.*

Having reviewed this matter, we conclude that, if we assume Plaintiffs' facts to be true for the moment, we must also conclude that the Village of Blanchester is liable for any final decisions made by Chief Payton with respect to the discharge of his criminal investigation responsibilities, in-

cluding the alleged decision to leave the pond unguarded, and, thereby permit Doan and others to move the body of Carrie. The Court finds that, if Plaintiffs' allegations are proven as true, the Village of Blanchester could be held liable for its own actions and omissions, as well as the actions and omissions of their Chief of Police. Therefore, this Court finds that there remain material factual questions with respect to municipal liability at this time. Accordingly, Defendant Village's Motion for Summary Judgement is DENIED (doc. 131) in regards to Plaintiffs' substantive due process claims as alleged in Count II of the Complaint.

### 5. *Qualified Immunity*

■ Qualified immunity protects an official from liability only in his personal capacity. *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). However, even if a plaintiff only prevails against an official in his official capacity, liability may not be imposed on the named official. *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Chief Payton has moved for summary judgment on the ground that he is immune from liability under 42 U.S.C. § 1983.

■ The doctrine of qualified immunity protects officials in civil cases from damages' liability, *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1094 (6th Cir. 1992), if their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). For a right to be "clearly established," the contours of the right must have been sufficiently clear so that a reasonable official would understand that his or her conduct violates that right. *Id.*, 475 U.S. at 818–19, 106 S.Ct. 1580. The unlawfulness of the official's or employee's conduct must be apparent in light of pre-existing law. *Wegener v. City of*

*Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, United States Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred. *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir.1988). The law requires that:

> [T]hose decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.

*Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir.1988).

In *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir.1982), the Sixth Circuit held that, "it is not necessary, in order to hold a police officer liable under § 1983, to demonstrate that the officer actively participated in striking a plaintiff." In *Smith v. Ross*, 482 F.2d 33, 36–37 (6th Cir.1973) held that, "a law enforcement officer can be held liable under § 1983, when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly," ... [and] "[a]cts of omission are actionable in this context to the same extent as acts of commission."

Government officials performing discretionary functions are entitled to qualified immunity from civil suits for damages arising out of the performance of their duties "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

"To successfully state a claim under 42 U.S.C. § 1983, a plaintiff must identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law." *Russo v. City of Cincinnati*, 953 F.2d 1036,

1042 (6th Cir.1992). "The key inquiry in analyzing a claim of qualified immunity is whether the defendant's alleged conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir.1994).

Plaintiffs in this situation must overcome two hurdles. "First, the allegations must state a claim of the violation of clearly established law. Second, the plaintiff must present evidence sufficient to create a genuine issue as to whether the defendant in fact committed the acts that violated the law." *Adams*, 31 F.3d at 386. Whether a plaintiff has met each of these two burdens is a question of law. *Id.*

Whether or not qualified immunity exists in a given case is a legal question for the court, unless there is a genuine issue of material fact regarding whether the defendant actually committed the acts that would violate a clearly established right. *See Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir.1997). The plaintiff bears the ultimate burden of proof to establish that the defendant is not entitled to qualified immunity. *See Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

In his Reply, Chief Payton asserts that he is entitled to qualified immunity under the facts, circumstances, and law of this case for three reasons (doc. 141). First, Chief Payton asserts that he never exerted custody or control over the body of Carrie Culberson. Second, a predeprivation hearing, as suggested by Plaintiffs, was impractical and not required. Third, Plaintiffs have failed to establish an inadequacy of Ohio state law remedies.

If Plaintiffs' factual allegations are viewed in a light most favorable to them, we have already held that Chief Payton did indeed have constructive custody or functional control over Carrie's body and either intentionally or recklessly released that control over to Doan and others. The property right held by the family in the body of the deceased was clearly established as of the September 3, 1996–search of the Baker Family property. *See Brotherton v. Cleveland*, 923 F.2d 477, 480–81 (6th Cir.1991) (property right held by the family in the body of the deceased was clearly established); *Whaley v. County of Tuscola*, 58 F.3d 1111, 1114 (6th Cir.1995) (same); *Nishiyama v. Dickson County*, 814 F.2d 277, 285–86 (6th Cir.1987), *overruled on other grounds by Graham v. Connor*, 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (the right to recover for injuries due to law enforcement conduct that shocks the conscience was clearly established).

At a minimum, Chief Payton's alleged actions violated his duty as the chief law enforcement officer, and at a maximum, he was either explicitly or implicitly involved in the coverup of Carrie's murder and the subsequent disposal of Carrie's body.

In addition, this Court has already found that Plaintiffs have presented enough evidence for a reasonable fact-finder to infer that Chief Payton violated their substantive due process rights, which were "clearly established" at the time of Chief Payton's alleged actions here. Moreover, the right to recover for injuries due to law enforcement conduct that "shocks the conscience" had been clearly established in this Circuit for many years prior to Carrie's death. *See Nishiyama*, 814 F.2d at 285–86.

Having reviewed this matter, and because we find that Plaintiffs' substantive due process rights were clearly established under the facts as alleged in Plaintiffs' Complaint, the Court must also find that qualified immunity cannot be accorded to Chief Payton under the facts as alleged. Accordingly, Defendant Payton's Motion for Summary Judgment on the issue of qualified immunity is DENIED (doc. 128).

### C. State Law Claims

Plaintiffs have brought state law claims of conspiracy, obstruction of justice, and intentional infliction of emotional distress

(doc. 1). Defendants argue that Plaintiffs cannot prove the essential elements of these claims, or, alternatively, that they are entitled to immunity under state law.

■ Federal courts have discretion to decide pendent state law claims if the federal and state claims "arise out of a common nucleus of operative fact." *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Thus, "[i]f the federal claims are dismissed before trial ... the state claim[s] should be dismissed as well." *Webb v. McCullough,* 828 F.2d 1151, 1160 (6th Cir.1987) (quoting *Gibbs,* 383 U.S. at 726, 86 S.Ct. 1130).

### 1. *Conspiracy*

In their Complaint, Plaintiffs assert as their sixth cause of action, a civil common law claim of conspiracy against Defendants (*see* doc. 1), as opposed to a federal civil rights claim, such as the "conspiracy to interfere with civil rights." *See* Title 42 U.S.C. § 1985; *see also Brooks v. American Broadcasting Companies, Inc.,* 737 F.Supp. 431, 441 (N.D.Ohio 1990) ("[S]ection 1985 requires that a conspiracy be established by the defendants, and the existence of the conspiracy must be pled in detail in order for section 1985 claims to survive a motion to dismiss.") (citing *Robinson v. McCorkle,* 462 F.2d 111, 113 (3d Cir.1972)).

On December 30, 1999, Plaintiffs, in agreement with Defendants, voluntarily dismissed all of their original claims against Chief Payton and the Village of Blanchester except the (1) 42 U.S.C.1983 due process claims, (2) intentional infliction of emotional distress claim, and (3) obstruction of justice claim (doc. 97).

In other words, Plaintiffs chose to voluntarily dismiss their federal VAWA claim and other state law claims. However, in their Response, Plaintiffs set forth the alleged merits of their previously dismissed state law conspiracy claim as if it were still viable (*see* doc. 139).

Having reviewed this matter, the Court will not address the merits of those claims, and will continue to treat them as having been VOLUNTARILY DISMISSED from this action. Accordingly, Defendants' Motions for Summary are GRANTED (docs. 128 & 131) in regards to Plaintiffs' state law conspiracy claim as alleged in Count VI of the Complaint (doc. 1).

### 2. *Obstruction of Justice*

■ The only law cited by Plaintiffs to support an Ohio state law claim for "obstruction of justice" is the case of *Thompson v. Webb,* 136 Ohio App.3d 79, 85–86, 735 N.E.2d 975, 980 (1999), *cert. denied,* 88 Ohio St.3d 1490, 727 N.E.2d 597 (2000), which affirms that no civil law exists in Ohio to support the proposition that Plaintiffs' civil claim of "obstruction of justice" exists as a civil tort.

Furthermore, the only law the *Thompson* court references with regard to obstruction of justice is Ohio Rev.Code Ann. § 2921.32—a codified criminal offense in Ohio, and the *Thompson* court implicitly rejected a similar civil cause of action. *Id.,* 136 Ohio App.3d at 85–86, 735 N.E.2d at 980 ("[Plaintiff] Thompson cites no law, state or federal, in support of this argument, and we have found no Ohio case recognizing a claim for tortious interference with a judicial proceeding.").

Moreover, Plaintiffs proceed to break down the criminal elements of this crime and then, without support in law, proclaim that those elements form a strict liability tort. This theory lacks merit and is, in fact, contrary to federal and state case law. *See James v. McCoy,* 56 F.Supp.2d 919, 935 (S.D.Ohio 1998) ("It appears that Mr. James may have intended to allege obstruction of justice under 18 U.S.C. § 1503. However, the federal obstruction of justice statute is penal and does not create a private cause of action.") (citing *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1482 (9th Cir.1997)); *see also Alex–Bell Oxford Ltd. v. Woods,* No. 16038, 1998 WL 289028, at \*2 (Ohio Ct.App. June 5, 1998)

("[W]e note that [Defendant] Woods prefaces each of his assignments [of error] with the claim that the trial court "obstructed the administration of justice." He then goes on to argue that criminal violations of R.C. 2923.31 and 2923.32 occurred. These kinds of allegations have no place in an appeal of a civil judgment. Criminal charges are brought, not in the name of an individual, but by and on behalf of the State of Ohio and its political subdivisions.") (citing *Biomedical Innovations, Inc. v. McLaughlin,* 103 Ohio App.3d 122, 126, 658 N.E.2d 1084 (1995)).

■ Where it is not apparent that the legislature intended to create a cause of action by enacting a statute, no private civil cause of action shall exist. *See Student Gov't Ass'n of Wilberforce Univ. v. Wilberforce Univ.,* 578 F.Supp. 935, 941 (S.D.Ohio 1983) ("[T]he Court may not find that a private right of action exists simply because permitting private enforcement of a particular statute would not be inconsistent with, or in fact, advance the purpose of the legislative scheme....") (citing *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979)); *see also Biomedical Innovations, Inc.,* 103 Ohio App.3d at 126, 658 N.E.2d at 1086 (finding that Ohio criminal charges are brought by and on behalf of the State of Ohio and its political subdivisions, not by or on behalf of an individual).

Having reviewed this matter, Plaintiffs have no standing to assert a state criminal statute as a civil tort in this lawsuit, and, therefore, Plaintiffs' arguments to the contrary are not well-taken. Accordingly, Defendants' Motions for Summary Judgment are GRANTED (docs. 128 & 131) in regards to Plaintiffs' state civil obstruction of justice claim as alleged in Count V of the Complaint (doc. 1).

### 3. *Intentional Infliction of Emotional Distress*

■ A claim for intentional infliction of emotional distress arises against "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Yeager v. Local Union 20,* 6 Ohio St.3d 369, 374, 453 N.E.2d 666 (1983). Thus, to prevail on such a claim, a plaintiff must offer evidence showing "serious emotional distress" resulting from the defendant's conduct. *Hockenberry v. Village of Carrollton,* 110 F.Supp.2d 597, 604–605 (N.D.Ohio 2000).

■ Specifically, on a claim for intentional infliction of emotional distress, a plaintiff must show that:

(1) the defendant either intended to cause emotional distress, or knew or should have known that the actions taken would result in serious emotional harm to the plaintiff;

(2) the defendant's conduct was extreme and outrageous;

(3) the defendant's actions proximately caused plaintiff's psychic injury; and

(4) the mental distress suffered by the plaintiff was serious.

*Piro v. Franklin Township,* 102 Ohio App.3d 130, 142, 656 N.E.2d 1035, 1043 (1995); *see also Barrett,* 22 F.Supp.2d at 746. Defendants argue that Plaintiffs have not offered sufficient evidence to prove these elements.

In their Response, Plaintiffs allege the following facts in support of this claim:

Richard Payton should have known that the actions he took by intentionally not securing Carrie Culberson's body would result in serious emotional distress for plaintiffs. He knew the family cared for Carrie, reported her missing, was frantically searching for her, and organized hundreds of people to search for Carrie. Richard Payton's actions of allowing the Bakers and Doan to remove Carrie's body from the pond were outrageous, indecent, and utterly intolerable....

Additionally without her body, the Culbersons cannot bury Carrie. They cannot have a funeral for her. They cannot go to her gravesite on her birthday, Mother's Day or Father's Day. Christina cannot go to Carrie's grave and tell her that, if she had lived, she would be [an] aunt now.

The Culberson's were deprived of Carrie's body as a direct result of Payton's decision to leave the pond unguarded. As a result, each has suffered greatly these last four years and will continue to suffer in the future until and if when Carrie's body is found.

(doc. 139).

Having reviewed all of the evidence, factual allegations and law presented, this Court finds that Plaintiffs have submitted sufficient evidence to meet their burden in order to deny Chief Payton's Motion for Summary Judgment in regard to this claim. *Carney v. Knollwood Cemetery Ass'n*, 33 Ohio App.3d 31, 37, 514 N.E.2d 430, 436 (1986) (holding that all blood descendants have a claim for emotional distress and outrageous disturbance of the remains of their relative). We conclude, therefore, that Plaintiffs have created a genuine issue of material fact as to whether Defendant Payton is liable for intentional infliction of emotional distress. Accordingly, Defendants' Motions for Summary Judgment are DENIED (docs. 128 & 131) in regards to Plaintiffs' intentional infliction of emotional distress claim as alleged in Count III of the Complaint.

#### 4. *Ohio State Law Immunity*

In their Complaint, Plaintiffs have asserted state law claims against all named Defendants for intentional infliction of emotional distress.

#### a. *State Law Immunity for the Village*

Political subdivisions are shielded from civil liability as provided by Ohio Rev.Code Ann. Chapter 2744. Specifically, Ohio Rev.Code Ann. § 2744.02(A)(1) provides a broad immunity, subject to the following enumerated exceptions:

> For purposes of this chapter, the functions of political subdivisions are hereby classified as governmental functions and proprietary functions. Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by an act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.

*Id.*

In Ohio, a presumption of qualified immunity is accorded official, governmental acts carried out by political subdivisions and their employees. Ohio Rev.Code Ann. § 2744.02; *see also Cook v. City of Cincinnati*, 103 Ohio App.3d 80, 85–86, 90, 658 N.E.2d 814, 817 (1995) (observing that there is a presumption of qualified immunity).

Political subdivisions may lose this presumption, however, if their alleged conduct causes an injury falling into one of the exceptions listed at § 2744.02(B)(1)-(5) of the Ohio Rev.Code:

> (1) Injuries caused by the *negligent* operation of a motor vehicle;
>
> (2) Injuries caused by the *negligent* performance of *proprietary* functions;
>
> (3) Injuries caused by the failure to keep open roads, highways and streets open, in repair and free from nuisance;
>
> (4) Injuries caused by *negligence* on the grounds of a building used for *governmental* purposes; or
>
> (5) Injuries for which liability expressly is imposed by the Ohio Revised Code.

*Id.* (emphasis added); *see also, Wilson v. Stark County Dep't of Human Servs.*, 70 Ohio St.3d 450, 452, 639 N.E.2d 105, 107 (1994) ("There are no exceptions to immunity for the intentional torts of fraud and

intentional infliction · of emotional distress.").

The Court notes that one of the five exceptions listed establishes the liability of political subdivisions for injuries caused by *negligent acts of employees with respect to proprietary functions.* Ohio Rev.Code Ann. § 2744.02(B)(2) (emphasis added). There is, however, no exception for governmental functions. *Haas v. City of Akron,* 51 Ohio St.2d 135, 136 364 N.E.2d 1376, 1377 (1977), *overruled on other grounds by Haverlack v. Portage Homes, Inc.,* 2 Ohio St.3d 26, 442 N.E.2d 749, 752 (1982) (holding that police services have always been considered a governmental function, not a proprietary function).

■ Consequently, except as specifically provided in § 2744.02(B)(1)-(5), with respect to government functions, political subdivisions retain their cloak of immunity stemming from an employee's negligent or reckless acts. *Garrett v. City of Sandusky,* 68 Ohio St.3d 139, 141 624 N.E.2d 704, 706 (1994). As stated earlier, we find that there are no statutory exceptions to political subdivision immunity for intentional torts, such as intentional infliction of emotional distress. *See, e.g., Fabrey v. McDonald Village Police Dep't,* 70 Ohio St.3d 351, 354–55 639 N.E.2d 31, 34–35 (1994); *Nungester v. City of Cincinnati,* 100 Ohio App.3d 561, 555–56, 654 N.E.2d 423, 426–27 (1995).

Plaintiffs have also made a claim in their Complaint for punitive damages. Ohio and federal law are both clear in that no such claim can be made against a municipality. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 261 n. 20, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). In their Response, Plaintiffs concede this point and acknowledge that punitive damages cannot be assessed to the Village in this action (doc. 139). Therefore, the Court will only consider the issue of punitive damages in regards to the personal liability of Chief Payton.

The Ohio Supreme Court explained the public policies behind the statutory immunity statutes for political subdivisions, such as the Village of Blanchester, in the case of *Wilson v. Stark County Dep't of Human Servs.:*

> The policies underlying R.C. Chapter 2744 support this interpretation. R.C. Chapter 2744 was the General Assembly's response to the judicial abrogation of common-law sovereign immunity. The manifest statutory purpose of R.C. Chapter 2744 is the preservation of the fiscal integrity of political subdivisions. R.C. Chapter 2744.01(C) encompasses a wide array of governmental functions, many of which are performed by political subdivisions through their departments and agencies.

*Wilson,* 70 Ohio St.3d at 453, 639 N.E.2d at 108 (holding that "[w]here a county is immune under R.C. 2744.02 in its operation of a human services department, that immunity extends to the human resource's department itself."); *see also Holzbach v. Jackson Township,* No. 19999–CA–00373, 2000 WL 1035798, at *2 (Ohio App. July 26, 2000) ("This court has previously reviewed the issue of political subdivision immunity *vis a vis* claims for the intentional torts of intentional infliction of emotional distress and defamation and have found political subdivisions not to be liable for intentional torts.") (citing Ohio Rev.Code Ann. §§ 2744 .02(A)(1) and (B)).

Having reviewed this matter, the Court finds that Defendant Village is accorded state law immunity, and, therefore, any argument by Plaintiffs to the contrary is without merit. Accordingly, the Court finds Defendant Village's Motion for Summary Judgment is GRANTED (doc. 131) in regards to Plaintiffs' state law claim of intentional infliction of emotional distress and the issue of punitive damages as alleged in Count III of the Complaint (doc. 1).[4]

4. However, the Court believes it is important to inform the Parties that, by our holding in

this manner, we do not mean to suggest or find that Plaintiffs are precluded from recov-

### b. *State Law Immunity for Defendant Payton*

Employees of a political subdivision enjoy individual, qualified immunity for conduct carried out (1) within the scope of their employment and (2) in connection with a government function, so long as that conduct cannot be described as malicious, reckless, or bad faith. Ohio Rev. Code Ann. §§ 2744.03(A)(1) and (6)(b). At issue in this case is, whether the acts of Chief Payton on September 3, 1996 were done "with malicious purpose, in bad faith, or in a wanton or reckless manner." *Id.* The issue of whether a defendant is entitled to immunity is a question of law. *Nease v. Medical College Hosps.*, 64 Ohio St.3d 396, 400, 596 N.E.2d 432, 435 (1992) (citing *Conley v. Shearer*, 64 Ohio St.3d 284, 292, 595 N.E.2d 862 (1992)).

Defendant Payton contends that he is immune under the provisions of § 2744.03(A)(6)(a)-(c), which provides immunity to governmental employees unless:

(a) His acts or omissions were manifestly outside the scope of his employment or official responsibilities;

(b) His acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

(c) Liability is expressly imposed upon the employee by a section of the Revised Code.

*Id.*

"Malice is the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." *Cook*, 103 Ohio App.3d at 90, 658 N.E.2d at 821 (citing *Jackson v. Butler County Bd. of Comm'rs*, 76 Ohio App.3d 448, 602 N.E.2d 363 (1991)).

"Bad Faith involves a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another." *Cook*, 103 Ohio App.3d at 90–91, 658 N.E.2d at 821.

"Wanton misconduct is the failure to exercise any care whatsoever." *Fabrey v. McDonald Village Police Dep't*, 70 Ohio St.3d 351, 356, 639 N.E.2d 31, 35 (1994) (citing *Hawkins v. Ivy*, 50 Ohio St.2d 114, 116–118, 363 N.E.2d 367 (1977)).

"Mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition toward perversity on the part of the tortfeasor." *Fabrey*, 70 Ohio St.3d at 356, 639 N.E.2d at 35 (citing *Roszman v. Sammett*, 26 Ohio St.2d 94, 96–97, 269 N.E.2d 420, 422 (1971)). "Such perversity must be under such conditions that the actor must be conscious that his conduct will, in all likelihood, result in an injury." *Id.*

The issue of whether a government employee acts with malice, bad faith, or in a wanton or reckless manner is a question for the jury. *See Barrett v. Outlet Broadcasting, Inc.*, 22 F.Supp.2d 726, 750–51 (S.D.Ohio 1997); *see also Fabrey*, 70 Ohio St.3d at 356, 639 N.E.2d at 35. In *Barrett*, the court held that the police commander who authorized a news crew to follow the police without regard to the suicide victim's privacy was a sufficient fact from which the jury could find that the commander's conduct constituted reckless disregard. *Barrett*, 22 F.Supp.2d at 751.

The terms used in the immunity statute were recently defined in *Caruso v. State*, 136 Ohio App.3d 616, 620, 737 N.E.2d 563, 567–68 (2000):

Malicious purpose encompasses exercising "malice," which can be defined as the willful and intentional design to do injury, or the intention or desire to harm

---

ering for their emotional distress' damages, as well as other provable damages at trial, from *both* Defendants in relation to their § 1983, substantive due process claims. Rather, what this Court holds today is simply that, Defendant Village is statutorily immune from liability in regards to Count III of Plaintiffs' Complaint (*see* doc. 1).

another, usually seriously, through conduct that is unlawful or unjustified.

Bad faith has been defined as the opposite of opposite of good faith, generally implying or involving actual or constructive fraud or a design to mislead or deceive another. Bad faith is not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.

Finally, "reckless conduct" refers to an act done with knowledge or reasons to know of facts that would lead a reasonable person to believe that the conduct creates an unnecessary risk of physical harm and that such risk is greater than that necessary to make the conduct negligent. The term "reckless" is often used interchangeably with the word "wanton" and has also been held to be a perverse disregard of a known risk. As to all of the above terms, their definitions connote a mental state of greater culpability than simple carelessness or negligence.

*Caruso*, 136 Ohio App.3d at 620, 737 N.E.2d at 567–68 (internal citations omitted).

Having reviewed this matter, we find that Plaintiffs have alleged sufficient facts to create a genuine issue of material fact whether Chief Payton's acts and omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner. Accordingly, Defendant Payton's Motion for Summary Judgment is DENIED (doc. 128) in regards to the issue of state law immunity for Plaintiffs' intentional infliction of emotional distress and punitive damages claims, asserted against Chief Payton in his personal capacity, as alleged in Count III of the Complaint (doc. 1).

### 5. *The Public Duty Doctrine*

In his Motion for Summary Judgment, Chief Payton, in the alternative, asserts that the Ohio public duty doctrine insulates him from state law liability. According to *Burgess v. Doe*, 116 Ohio App.3d 61, 686 N.E.2d 1141 (1996):

The public duty doctrine provides that a state cannot be held liable to an individual for breach of duty owed to the general public: "When a duty which the law imposes upon a public official is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, is generally a public and not an individual injury."

*Burgess,* 116 Ohio App.3d at 66, 686 N.E.2d at 1144. Whether a duty exists between Chief Payton and Plaintiffs is a question of law. *Clemets v. Heston,* 20 Ohio App.3d 132, 134–35, 485 N.E.2d 287, 290 (1985).

Having reviewed this matter, the Court finds that, for the same reasons we concluded that the Supreme Court case of *DeShaney* did not automatically shield Chief Payton from federal liability in this case, we also find that the case of *Burgess* and the public duty doctrine does not automatically shield Chief Payton from the remaining intentional infliction of emotional distress state law claim. We conclude that there are genuine issues of material fact which exists at this time in regards to whether Chief Payton's actions during the September 3, 1996–search created a "special duty" to Plaintiffs, and, thus caused an individual injury to them. *See Commerce & Industry Ins. Co. v. City of Toledo*, 45 Ohio St.3d 96, 101, 543 N.E.2d 1188, 1195 (1989). Accordingly, Defendant Payton's Motions for Summary Judgment is DENIED (doc. 128) in regards to the issue of personal state law immunity due to the public duty doctrine.

### CONCLUSION

Having reviewed this matter and for the reasons set forth above, this Court concludes that there are genuine issues of material fact that precludes a finding in favor of Defendants as a matter of law in regards Counts II and III of Plaintiffs' Complaint, as explained in the Discussion Section of this Order, and, therefore, Defendants' Motions for Summary Judgment

are GRANTED–IN–PART and DENIED–IN–PART (docs. 128 & 131).

Accordingly, in anticipation of a trial on the merits in this matter, the Court hereby SETS the following trial schedule for this action: (1) a Final Pretrial Conference is schedule for Thursday, December 21, 2000, at 10:00 A.M.; (2) any pretrial motions or motions-in-limine, particularly on the issue of the admissibility, application, and use of Chief Payton's criminal conviction in relation to Defendant Payton and/or Defendant Village, are to be filed by the Parties with the Parties' proposed Joint Final Pretrial Order on the date of the Conference; (3) any proposed jury instructions, jury interrogatories, or special verdict forms are to be submitted to the Court by no later than 10 days prior to the date of trial; and (4) the trial on the merits remains on schedule for Monday, January 22, 2001.

SO ORDERED.

### AMENDED ORDER

This matter is before the Court on Plaintiffs' Motion for an Order Seeking Remand from the Sixth Circuit Court of Appeals for the Purpose of Regaining Jurisdiction to Approve Plaintiffs' Motion to Dismiss (doc. 156) and the Sixth Circuit's January 2, 2001 Order. Defendant Village of Blanchester did not file a Response to Plaintiffs' Motion to Remand.

On December 14, 2000, the Court issued an Order (see doc. 144) that granted-in-part and denied-in-part Defendants' Motions for Summary Judgment (see docs. 128 & 131).

In relevant part, this Court denied Defendants' Motions with respect to Plaintiffs' claims of substantive due process, pursuant to Title 42 U.S.C. § 1983 (doc. 144). Furthermore, we denied Defendant Payton's Motion for Summary Judgment on the basis of qualified immunity (Id.). With respect to the remaining Ohio state law claim of intentional infliction of emotional distress, this Court granted Defendant Village immunity pursuant to state law, but denied such immunity to Defendant Payton (Id.).

On December 18, 2000, Defendant Payton filed a Notice of Appeal to the Sixth Circuit in regards to our December 14, 2000 Order (doc. 146). In his Notice, Defendant Payton asserted that he wished to appeal that part of our Order "which denied [him] summary judgment based on qualified immunity with respect to plaintiffs' claims pursuant to 42 U.S.C. § 1983 and based upon sovereign immunity under R.C. Chapter 2744 with respect to plaintiffs' intentional infliction of emotional distress claim" (Id.).

On the same day, Defendant Village also filed a Notice of Appeal (doc. 147) from the denial of their Motion for Summary Judgment, and requested "that this Court exercise pendant appellate jurisdiction over its appeal since the issues on the two appeals are inextricably intertwined" (Id.).

Furthermore, on December 18, 2000, Plaintiffs filed a Motion to Dismiss the Section 1983 Claims Against Defendant Payton in His Individual Capacity (doc. 148), followed on the next day by Defendants' Responses to that Motion (docs. 149 & 152).

In their Motion to Dismiss, Plaintiffs advised this Court that they wanted to voluntarily and partially dismiss only Count II of the Complaint (see doc. 1), the federal substantive due process claim brought against Defendant Payton in his individual capacity (doc. 148). Plaintiffs indicated that their reason for the proposed voluntary entry of dismissal on the § 1983 claim against Defendant Payton in his individual capacity was because, they wished to keep the case in its present posture for the scheduled trial set for January 22, 2001 (Id.).

Shortly thereafter, Plaintiffs also filed with the Sixth Circuit their Emergency Motion to Dismiss the Interlocutory Appeal for Lack of Jurisdiction asserting the same or similar arguments that were already made in their Motion to Dismiss.

See *Culberson v. Doan,* Nos. 00–4581/4582 (6th Cir. Dec. 20, 2000) (Martin, C.J.) (doc. 153).

On December 21, 2000, this Court issued a Recommendation indicating that, if this action was remanded to this Court by the Sixth Circuit, we would grant Plaintiffs' Motion to Dismiss and also dismiss-in-part other counts of the Complaint (doc. 161). At about the same time, Plaintiffs filed a collateral Motion to Remand with the Sixth Circuit formally asking the appellate court to remand this action to this Court in accordance with the Sixth Circuit's December 20, 2000 Order (*see* docs. 153 & 156) and pursuant to the holding of *First Nat'l Bank of Salem, Ohio v. Hirsch,* 535 F.2d 343 (6th Cir.1976) (per curiam). Defendants did not file a response to Plaintiffs' Motion to Remand.

On January 2, 2001, the Sixth Circuit issued its ruling in the case of *Culberson v. Doan,* Nos. 00–4581/4582, at * 2 (6th Cir. Jan. 2, 2001) granting Plaintiffs' Motion to Remand this action back to this Court.

Accordingly, the Court hereby AMENDS our December 14, 2000 Order (doc. 144) as follows:

(1) this Court hereby GRANTS Plaintiffs' Motion to Dismiss the Section 1983 Claims Against Defendant Payton in His Individual Capacity WITH PREJUDICE (doc. 148); (2) we also hereby DISMISS–IN–PART and WITHOUT PREJUDICE COUNT II of the Complaint (*see* doc. 1), the substantive due process claim asserted against Defendant Payton in his official capacity, and, finally; (3) this Court hereby DISMISSES WITHOUT PREJUDICE Count III of the Complaint (*see* doc. 1), the intentional infliction of emotional distress claim asserted by Plaintiffs against Defendant Payton in his individual capacity.

In conclusion, the Court hereby SETS the following trial schedule for this action: (1) the Final Pretrial Conference is SCHEDULED for Thursday, January 4, 2001, at 3:00 P.M.; (2) any additional pretrial motions, as well as any responses or replies to the Parties' motions-in-limine are to be submitted with the proposed Joint Final Pretrial Order on the date of the Conference; (3) any proposed jury instructions with citations, specific jury interrogatories, or special verdict forms are to be submitted to the Court by no later than 10 days prior to the date of trial; and (4) the trial on the merits remains on schedule for Monday, January 22, 2001, at 9:00 A.M.

SO ORDERED.